## Eckles v. Sharp

*Leon E. Sperling*, for plaintiff.
*Cadmus Z. Gordon, Jr.*, for defendant.

SLOANE, J., October 21, 1941.—This is a suit in assumpsit by a minor daughter (through her guardian) against her natural father. An affidavit of defense was filed to the statement of claim. Claiming the defense to be insufficient as to amounts admittedly not paid, a rule for judgment was taken, and that rule is what we have before us for solution.

A shorthand account is necessary to a discussion: The father, his now-divorced wife, and her parents, because of "unhappy differences", agreed in writing: The maternal grandparents were to have "complete cus-

tody" of plaintiff daughter; defendant father was to pay $50 a month for the daughter beginning July 1, 1929; he was to be permitted to visit her at all times, "to take her to see her grandparents [presumably paternal], and also, when she attains the age of nine years, he shall be permitted to take her on trips . . . with the consent" of the custodian grandparents.

Suit was brought for the monthly amounts from December 1, 1929, to the date of this legal action.

It struck us that we ought to decide betimes whether a minor daughter can sue her natural father in contract. She can. Research was burrowing, I suppose because in opinion and text alike the answer, like many an answer in the law, is taken for granted, with virtual unanimity in the conclusion that such an action will lie. See 46 C. J., Parent and Child, pp. 1318, 1324, §§141, 158-159, 4 Vernier, American Family Laws (1936) 480, §267, Madden, Handbook on Law of Persons and Domestic Relations (1931) 409, 442, 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed., 1921) 716, 717, 2 Williston on Contracts (rev. ed., 1936) 1044, 13 Standard Pa. Practice (1939) 320-321, McCurdy, Torts Between Persons in Domestic Relation, 43 Harv. L. Rev. 1030, 1058, 1075 (1930), Steel, Exec., v. Steel, 12 Pa. 64 (1849), Titman's Administrator v. Titman, 64 Pa. 480 (1870), Kingan's Estate, 24 Pitts. (O. S.) 41 (1876), Abbott v. Converse, 4 Allen 530, 533 (Mass. 1862), Hall v. Hall, 44 N. H. 293, 296 (1862), and Dunlap v. Dunlap, 84 N. H. 352, 354, 360 (1930). There is considerably greater discussion of the availability of a remedy for torts between parent and child—and the courts are not in accord in their decisions on that question. See McCurdy, Torts Between Persons in Domestic Relation, supra, and Dunlap v. Dunlap, supra. But wherever the matter has been considered, and regardless of whether suit is allowed in tort, it is assumed that access to the courts is not to be denied parent or child for determination between them-

selves of property rights, including contract rights. See Mesite v. Kirchenstein et al., 109 Conn. 77, 145 Atl. 753 (1929), Bulloch v. Bulloch, 45 Ga. App. 1, 163 S. E. 708 (1932), Lusk v. Lusk et al., 113 W. Va. 17, 166 S. E. 538 (1932), and Luster v. Luster, 299 Mass. 480, 13 N. E. (2d) 438 (1938). In Minkin et al. v. Minkin, 336 Pa. 49, 56 (1939), Mr. Justice Stern stated in a concurring opinion:

"I am of opinion . . . that it is not against public policy for a minor to sue his parent, whatever the form of the action, where the suit is to vindicate *property* rights and not to recover damages for acts of violence or negligence affecting the person."

The allowance of a suit for vindication of property rights is not to be regarded as an exception to a general rule of nonaccess to the court by a child against his parent.

"There never has been a common-law rule that a child could not sue its parent. It is a misapprehension of the situation to start with that idea, and to treat the suits which have been allowed as exceptions to a general rule. The minor has the same right to redress for wrongs as any other individuals. In the investigation of the subject, the starting point is a general right to demand reparation. The limitations which have been put upon that right have been deduced from prevalent ideas touching family life, and especially parental rights and duties. And here, as one distinguished writer has put it, we 'are in the realm of belief and emotion.' 43 Harv. Law Review, 1076. Opposing views have not infrequently been advocated with rhetoric rather than by reason. Out of it all there emerges one substantial and reasonable ground for denying a recovery, and one only. The parental authority should be so far supreme that whatever would unduly impair it should be foregone by the child for his ultimate good": Peaslee, C. J., in Dunlap v. Dunlap, 84 N. H. 352, 354 (1930).

None of the reported cases has imposed limitations of this sort on the minor's right to sue his parent in contract; and considering the rationale behind such limitations as have been set up by some courts in other types of cases (e. g. torts) we feel that the present suit should be allowed as though it were between strangers.

"As often stated before, the sole debatable excuse advanced for the denial of the child's right to sue is the effect a suit would have upon discipline and family life. If, therefore, the situation is such that the suit will not affect those matters at all, the reason for the theory fails and it should not be applied": Dunlap v. Dunlap, supra, p. 367.

If the courts fear that allowing suit in tort would encourage a child, disgruntled by the rightful exercise of discipline, to seek judicial interference in domestic matters which should not be so hampered, it is difficult to see how the allowance of a suit by a child on a contract validly and consciously entered into by his parent would interfere with the parent's assertion of "discipline". And especially is this true where the family bond has been severed for some time by divorce of the parents, and adoption of the child by her maternal grandparent as in the instant situation. Defendant father no longer has the proverbial rod which this action might suspend or intersect. The fact that in this particular case the family tie has already been broken is an effective answer to those tribunals which, in denying suits by infants, visualize the determining factor as a desire to avoid friction or disruption of the quietude of the home.

By what we have said we give basis to the assertion that there are no cases denying a child's right to sue his parent in contract, and that the theory for such denial in tort cases has no application to contract actions in general and to this one in particular. There are cases usually cited as upholding the type of proceeding now before us. They are, to a good extent, actions by a child against the estate of the deceased parent on alleged

promises of remuneration for support or services rendered: Conrad v. Conrad et al., Admrs., 4 Dall. 130 (Pa. 1793); Neiman v. Gilbert, 1 Woodw. 135 (Pa. 1863); Titman's Administrator v. Titman, 64 Pa. 480 (1870); Abbott v. Converse, supra; Hall v. Hall, supra. The institution of the action occurring after the parent's death would seem to suggest the non-applicability of the rule since the reasons therefor would no longer exist. But the question before the court, after the parent's death, would necessarily concern the existence of a cause of action *before* his demise. If none existed before death, none would arise thereafter. Conversely, allowance of the claims against decedent's personal representative would be indicative of the recognition that such existed during his lifetime. This is tacitly assumed in most cases, explicitly stated in others. See, for example, Hall v. Hall, supra, at page 296:

"If . . . the father employed his daughter, to whom he had released his right to her services, and agreed to pay her wages for her labor, *he and his estate are bound by the contract*, and the daughter may well maintain her action." (Italics supplied.)

But there is one great difficulty in interpreting these cases as indicative of a right in an *unemancipated* minor to sue his parent on a contract. That arises out of the fact that an agreement by a parent to pay a minor child for services is generally held to constitute an "emancipation" of the child: Hall v. Hall, supra, p. 296; Abbott v. Converse, supra, pp. 533, 534; Dunlap v. Dunlap, supra, pp. 364, 366; Havighurst, Services in the home—A Study of Contract Conceptions in Domestic Relations, 41 Yale L. J. 386, 398 (1932); 20 R. C. L. 608 et seq. Hence these cases would be authority only for the proposition that an *emancipated* child could sue.

In addition to the above-cited Pennsylvania decisions pointing to a recognition of the child's right to sue a parent in contract, there are recent cases which in-

ferentially lend support to this view. Take Brill v. Brill, 282 Pa. 276 (1925). There plaintiff, an illegitimate child, brought action, by his next friend, to recover on a bond executed by defendant who was alleged to be plaintiff's father. Although the obligee on the bond was plaintiff's mother, the court allowed recovery by plaintiff as a third party beneficiary. Had the court held, in that case, that defendant was the father of plaintiff, we might hold it as direct precedent and determinative of our case. Defendant had denied paternity in his affidavit of defense, but the court did not consider what effect it would have had on plaintiff's right to sue if defendant's paternity had been proved as alleged by plaintiff. In Greene County, for use, v. Southern Surety Co., 292 Pa. 304, 312 (1927), Mr. Justice Kephart treated the Brill case as though it were one between father and son: "In Brill v. Brill . . . the question was one of public policy. The father, admitting an illegitimate child to be his own, was in duty bound to care for it, and his bond in whatever amount necessary should be sustained against him as a matter of public policy. Our statutes cover care of children born out of wedlock, and putative fathers should not be permitted to play fast and loose with their obligation to care for and educate their illegitimate children."

And Mr. Justice Stern, who wrote the opinion of the lower court in the Brill case, subsequently stated in Minkin et al. v. Minkin, supra, that he saw no public policy against suits by minor children against parents to vindicate property rights. If there is a public policy which favors recovery by an illegitimate child on an obligation executed by the putative father in recognition of his duty to support that child, by that there is stronger reason to permit such recovery by a legitimate child whose father, cognizant of parental care, executed a written instrument.

The rule for judgment is based upon the insufficiency

of the father's defenses: (1) A written release pursuant to legal adoption by the maternal grandparents; (2) the statute of limitations; and (3) a breach of the agreement.

The release is not a defense. The daughter plaintiff is a third party beneficiary of the contract, and upon its execution obtained rights which could not be taken away or impaired by any later act of the father, the obligor, or by a mutual agreement between the contracting parties such as a release: Brill v. Brill, supra.

While we might be markedly inquisitive over a ten-year silence, our curiosity is extra-legal right now, for the lapse and the statute of limitations are not a defense. Not only is the contract a sealed instrument as to which the statute has not run, but the statute expressly excepts infants from its operation (Act of March 27, 1713, 1 Sm. L. 76, sec. 5, 12 PS §35) and this exception makes no distinction between infants with and those without guardians: Fassitt v. Seip, 249 Pa. 576 (1915).

The affidavit of defense indicates one defense to this action which prevents us from closing the matter by summary judgment. It avers that plaintiff's maternal grandparents refused to permit defendant to visit his daughter, without just cause and in violation of the terms of the contract. The rights the daughter obtained by the contract were only those granted, and the breach of any conditions or terms which were to be performed by someone other than the obligor would relieve him of the obligation to continue his performance. The presence of third-party rights under the contract cannot increase the obligation undertaken or remove the conditions bargained for as the quid pro quo for such obligation:

" 'A person for whose benefit a contract is made must take it subject to equities and defenses arising out of the breach by one of the parties thereto . . .' ": Crew-

Levick Co. v. Philadelphia Investment B. & L. Assn., 117 Pa. Superior Ct. 397, 407 (1935).

This is no more than the application of basic contract rules consistently followed by the courts: Unverzagt v. Prestera et al., 339 Pa. 141, 144 (1940) ; Grim et al. v. Thomas Iron Co., 115 Pa. 611 (1887) ; Torrens et al. v. Campbell, 74 Pa. 470 (1873).

". . . if a contract . . . ceases to be binding in whole or in part because of . . . the present or prospective failure of the promisee to perform a return promise which was the consideration for the promisor's promise, the right of a . . . beneficiary . . . is subject to the same limitation": A. L. I. Restatement of Contracts, sec. 140.

The contract on which the present suit is founded provides that the custodian grandparents permit defendant father to visit his daughter, such "permission to be with the consent and approval of [plaintiff's grandparents]". If this permission and consent are what defendant bargained for as his benefits under the contract, they constitute a condition to his obligation to pay support and he should be permitted to prove its breach. Such proof would be an adequate defense to this action.

But the father should be more extended in his allegation of breach. He merely avers that permission to visit his daughter was refused by her grandparents without just cause on "several occasions". The times of and circumstances surrounding such refusal are material and important. They bear upon the questions of whether the permission was a condition of the contract, whether the refusals justified the failure to continue to pay support to plaintiff, and whether his right to visit his daughter was waived by defendant. The daughter is entitled to more particularity concerning the alleged breach.

We need not enter judgment against defendant because of this lack of preciseness in averment, but con-

sider it proper to allow him to amend or supplement so that his apparently meritorious defense may be fully set forth. See Andrews v. Blue Ridge Packing Co., 206 Pa. 370, 374 (1903) (supplemental affidavits of defense will be permitted if it "appears probable that the defense is good and the defect merely in the mode of statement"), and Broderick, Superintendent of Banks, v. Allis, 26 D. & C. 60, 71 (1936).

Defendant is given leave to file an amended or supplemental affidavit of defense within 15 days hereof, otherwise rule absolute.